# NATIONAL TUBE COMPANY In re application for remission of taxes.

Board of Tax Appeals.

No. 13164.   Decided December 26, 1950.

## ENTRY

This cause and matter is before the Board of Tax Appeals on an application under §5624-10 GC, filed herein under date of July 8, 1947, by National Tube Company, a New Jersey corporation doing business in the State of Ohio, for the remission of certain alleged delinquent real property taxes and penalties thereon for the tax years 1942, 1943 and 1944, which alleged delinquent taxes and penalties were theretofore on April 11, 1947, assessed and extended by the county auditor of Lorain County, Ohio, on the then current 1946 tax list and duplicate as back taxes for said years on certain property then and theretofore owned by said company and described as "buildings added" on Original Lot 88, 70.40 acres, Lorain-Sheffield taxing district, in the City of Lorain, Lorain County, Ohio.

It is stated in the application that said back taxes for the tax years 1942, 1943 and 1944 and penalties thereon, aggregating in amount the sum of $99,808.76, were illegally assessed by the county auditor and were assessed in consequence of his negligence and error in that the property against which the assessment of back taxes and penalties thereon was made, to wit: Two certain rebuilt blast furnaces (3 and 4) and certain named accessory and appurtenant structures and installations constituting a part of such blast furnace units,

had been theretofore assessed and taxed for the then current years 1942, 1943 and 1944, respectively, as real property and as a part of said original lot 88 on which such rebuilt blast furnaces and accessory structures were located, and as a part of the total and unsegregated amount and value of all the buildings and structures taxed as real property and comprised in the company's integrated steel plant at this location, including, among other things, ore docks, coke ovens, blast furnaces, open hearth and Bessemer converter plants, shaping mills and tube mills.

In said application and as an independent and additional ground for the remission of the taxes and penalties therein complained of, it is alleged that such taxes and penalties were assessed illegally and in consequence of the negligence and error of the county auditor in that said blast furnaces and accessory structures on which such back taxes were assessed for said tax years, were and are personal property and were not, therefore, legally assessable as real property.

The case was submitted to the Board of Tax Appeals on said application, upon a stipulation of some of the facts in the case, upon the evidence offered and introduced by and on behalf of the applicant and by and on behalf of the county auditor on a hearing of the case before an attorney examiner of the Board and on the briefs of counsel. On consideration of the case as thus submitted, the Board of Tax Appeals on June 22, 1948, and thereafter again on July 21, 1948, made and entered its decision and order dismissing this application for the remission of such taxes and penalties for want of jurisdiction in the Board to grant the relief requested therein, and this for the reasons stated in said decision and order. Thereafter, the Supreme Court of this State, on appeal of the case to that court, reversed this decision and order of the Board of Tax Appeals and remanded the case to the Board for a hearing and determination of the questions presented by said application. See **National Tube Company v. Ayres, Auditor, 152 Oh St 255.**

Following this decision of the Supreme Court, the case was again submitted to the Board of Tax Appeals on said application and on the stipulation and evidence originally offered and introduced on the hearing of the case, and on additional briefs filed herein by the parties. Following this submission of the case, the members of the Board viewed said blast furnaces and accessory structures, as well as other property of the applicant, at this location.

On a consideration of the case as thus resubmitted to the Board, it appears that for many years the appellant has

owned about 1400 acres of land on the south bank of the Black River and extending back some distance therefrom: included in which acreage were Original Lots 83 to 92, inclusive, comprising in the aggregate about 760 acres of land. Upon this land, referred to as that part of applicant's property "inside the fence," the applicant has constructed and operated a completely integrated plant for the manufacture of welded and seamless steel pipes and tubing, consisting of ore and limestone docks, blast furnaces, coke ovens, open hearths and Bessemer converter shops, blooming mills, skelp mills, welding mills, seamless tube mills, and other accessory structures and installations necessary in the operation of this plant and of the several parts thereof. All the blast furnaces, and as to valuation, the larger part of the other buildings and structures of this plant are located on Original Lot 88, the 70.40 acre tract of land above referred to; and at all the times here in question, and both prior and subsequent thereto, all of the buildings and other structures in this plant taxed as real property have been, for some reason, assessed as "buildings" on said Original Lot 88.

It appears that for the tax years 1940 and 1941, the land comprised in Original Lot 88 and the buildings and structures taxed as real property in this plant were assessed on the tax list and duplicate of the county at aggregate determined tax valuations in stated amounts without any breakdown between land and "building" valuations. For the tax year 1942 and for each of the other tax years here in question, there was a segregation of the land valuation of said Lot 88 and of the aggregate valuation of the buildings and structures of the plant assessed as "buildings"; as is illustrated by the entry on the tax list and duplicate for the tax year 1942: "1942* Original Lot 88 Description; OL 88 inside fence 70.40 acres, Pearl Avenue, Land 101,380, Buildings 11,704,880, Total 11,806,260." For the tax years 1943 to 1946, inclusive, the assessed land and "buildings" valuations of the company's plant and of the buildings and structures taxed as real property thereof were: 1943, land $101,380, buildings $11,704,880, total $11,806,260; 1944, land $101,380, buildings $11,746,560, total $11,847,940; 1945, land $98,560, buildings $17,914,290, total, $18,012,850; at no time, however, in any of the tax years above noted were there separately assessed valuations of any of the more than 200 separate buildings, structures and other items of fixed machinery and equipment of this plant; but they were assessed together on a lump sum valuation thereof, as above indicated, and not otherwise. And as to this, it is stipulated that prior to the detailed appraisal of this plant

and of the buildings and structures thereof by J. M. Cleminshaw, an appraisal engineer acting as deputy county auditor, which appraisal was made as a part of the sexennial appraisal of the real property in the county, and which was completed in 1945, "the auditor had neither made nor maintained any detailed or itemized record of applicant's property assessed by him." And in this connection it is pertinent, perhaps, to note that the net book value of the company's real property investments at this plant,—the amount by which the book cost of the property exceeded the book reserves for depreciation thereof—, as shown by its records and indicated by the balance sheets filed with its annual intangible and personal property tax returns, was a lump sum valuation of such real property and of the several items thereof as a whole. Likewise, as thus indicated, the net amount of additions to the plant property (the book cost of additions over the book cost of property removed) or of net removals (book costs of property removed over the book cost of additions) in any of said years, was likewise an addition to or deduction from the book cost of such real property as a whole.

As above noted, the back taxes and penalties which are the subject under consideration on this application for the remission thereof, were assessed by the county auditor on two certain blast furnaces (3 and 4) and accessory structures of the appellant for the tax years 1942, 1943 and 1944, on the tax list for the then current 1946 tax year; which taxes were so assessed on the view that such blast furnaces and other structures were omitted property within the purview of §§5573 and 5564 GC, and were assessable as such. As to this. it appears that the company owns and operates five blast furnaces together with accessories thereof; two of which (1 and 2) were originally constructed in 1898 and 1899, two more (3 and 4) in 1904, and one (no. 5) in 1907. Blast furnaces Nos. 1, 2 and 5 are located contiguously in a designated area in this lot or tract of land, while blast furnaces Nos. 3 and 4 are located together in another area in this same lot, a comparatively short distance west of the other blast furnaces. Prior to the times here in question each and all of these blast furnaces had been either wholly or partially rebuilt at intervals of 12 to 15 years, while the refractory blocks and bricks forming the inner lining of the stack shell had been torn out and replaced every 5 or 6 years. In February. 1940, the company commenced the work of rebuilding blast furnace No. 3 by demolishing the old furnace and by constructing a new furnace on a new concrete mat or foundation at the same location. The new construction included the stack of the

furnace and every part thereof, including the hearth, bosh and the bells and other charging equipment at the top of the furnace, the refractory blocks and bricks lining the stack, as well as the skip hoist, which carries the charging material to the top of the furnace, and the cast house at the bottom of the furnace where the molten iron and slag are tapped and run off. Not all of the structures used in the operation of blast furnace No. 3, and included in the valuation of the furnace as a separate unit in the assessment of the back taxes herein complained of, were newly constructed at this time. This is true with respect to the stoves, gas washers, dry gas cleaners, and a number of other items of equipment which were merely reconditioned and improved by the installation of new appliances of different kinds. The work of rebuilding blast furnace No. 3 was completed on or about March 2nd, 1941. This blast furnace, as rebuilt, has a production capacity of 1150 tons of iron per day, as against an 800 ton capacity of the old furnace.

Likewise, in the year 1941 the company constructed or rebuilt a number of other small houses or structures which, although they are used in connection with the operation of blast furnace No. 3, were not included with the blast furnace as to valuation or otherwise in the assessment of the back taxes on the furnace herein complained of; but they were separately assessed as omitted property for said tax years. The structures referred to are: A skip-hoist house, a concrete clay house and a brick pump house. In this connection, it is pertinent to note that in 1940 the company constructed or rebuilt a sintering plant, so-called, which is a building or structure in which metallic dust recovered from the gases escaping from the company's several furnaces, is reduced to the form of a cinder which is recharged with the iron ore into these furnaces.

In 1942, and between the months of January and June of said year, the company rebuilt blast furnace No. 4. The work on this blast furnace and on the several units thereof was as to new construction, or otherwise, quite identical with the work done in rebuilding blast furnace No. 3. And blast furnace No. 4, as rebuilt, likewise has a production of 1150 tons of iron per day as compared with the 800 ton capacity of the old furnace. Likewise, in connection with the rebuilding of blast furnace No. 4 in 1942, the company in the same year constructed a number of small houses or other structures which are here referred to as a skip-hoist house, a concrete clay house, a brick pump house, a brick pyrometer house, a brick sub-station and a Crocker-Wheeler generator unit.

Although these houses or structures are used in connection with the operation of blast furnace No. 4, they are not included as units of the blast furnace in the assessment of the back taxes on the furnace here in issue; these structures were separately assessed as omitted property for the tax years 1943 and 1944.

In the year 1943 there were erected as a part of the steel plant three comparatively small sanitary buildings and there were also constructed or installed certain gas lines, so-called, all of which were separately assessed as omitted property for the tax year 1944.

At the time blast furnace No. 3 was built, the City of Lorain, Ohio, where this steel plant is located, did not have a system of building registration and inspection; and no permit was issued by the city either for the demolition of old furnace No. 3 or for the construction of the new furnace. However, as to this, it appears that sometime early in the year 1941 Mr. C. S. Kelser, the then county auditor of Lorain County, was advised in some manner of the construction by the company of this blast furnace and of the sintering plant, above referred to. By reason of this knowledge on his part of the rebuilding of such structures, and by reason of the view entertained by him that there was a general appreciation of building values, Mr. Kelser, as county auditor, sought and obtained a conference with representatives of the company in regard to a proposed increased building valuation of the buildings and structures to be assessed on and as a part of this parcel of land. This conference, which was held in the year 1941, and sometime after the month of April of said year, at the office of the company at Lorain, was attended by Mr. Kelser, Mr. C. A. Horn, then chief deputy county auditor, and Mr. W. J. Wright, county treasurer representing the county, and by Mr. Ed Price, general superintendent of the plant, and by Mr. J. A. Daniel, the company's tax representative, on behalf of the company. It appears that at this conference the county auditor made the suggestion that for the reasons above stated there should be a very substantial increase in the building valuation of this plant—the increase suggested by the county auditor being greatly in excess of that thereafter agreed upon by him and by the representatives of the company. From the evidence in the case, it appears that the amount of the increase in the buildings valuation of the plant thus agreed upon was $1,300,000 or, perhaps, an amount slightly in excess of this figure. This increase so agreed upon is apparently reflected in the aggregate assessed valuation of the land and buildings for said tax year—$11,806,260 which is $1,370,480 in excess

of the aggregate assessed land and buildings valuation of the plant for the tax year 1940. In this connection, it is pertinent to note that for the tax year 1942 the county auditor, for the first time for some years, made a separation of the land and building valuations of this parcel as follows: Land $101,380, buildings $11,704,880, total $11,806,260.

This building valuation of $11,704,880 is, by way of coincidence or otherwise, the same as the buildings valuation of this parcel for the tax year 1930.

When blast furnace No. 4 was rebuilt during the forepart of the year 1942 the City of Lorain did have a system of building registration and inspection—the ordinance providing therefor having been passed October 20, 1941. Acting under the authority of this ordinance, the building inspector of the city issued a permit for the demolition of old blast furnace No. 4. However, no permit was issued for the construction of the new furnace and this for the reason that the authorities of the city decided that no permit was necessary for this purpose. As to this, it appears, however, that both Mr. Kelser, the then county auditor, and Mr. Frank Ayres, who was then auditor of the City of Lorain and who succeeded Mr. Kelser as county auditor in March, 1943, were then advised of the construction of this new blast furnace No. 4; for both of these men attended a celebration of some kind in the City of Lorain which was had in connection with the "blowing-in" of this blast furnace sometime after its completion in June, 1942.

With respect to this blast furnace No. 4, as rebuilt, Mr. Kelser, as a witness at the hearing of the case before the examiner, and in answer to a question as to whether or not he made any specific additions to the assessment of the company's property on account of any added value that might have accrued to the plant by reason of said new blast furnace, said: "I don't recall that we added anything on that." And the valuation of these blast furnaces Nos. 3 and 4 and all of the other buildings and structures of the plant in the aggregate were assessed on and with respect to said parcel of land (OL 88) for the tax year 1942 at a "buildings" valuation of $11,704,880 which, together with the assessed land value of this parcel for said tax year, $101,380, amounted to $11,806,260; and the assessed land and buildings valuations of this parcel for the tax year 1943 were identically the same as those for the tax year 1942. With respect to the assessed buildings valuation of this parcel of land for the tax years 1942 and 1943 at the lump sum figure of $11,704,880, as above noted, it is pertinent, perhaps, to further note that according

to the company's records and its annual balance sheets, before referred to, the net removals of items of real property at this plant for the year 1942 amounted, at book cost, to the sum of $185,960; while in the year 1943 the net additions of items of real property at this plant amounted, at book cost, to the sum of $225,387. For the tax year 1944 the assessed land value of this parcel was $101,380 and the assessed buildings valuation was $11,746,560, total $11,847,940. Sometime in the year 1945 Mr. J. M. Cleminshaw, an appraisal engineer acting as deputy county auditor of said county, made and completed a detailed and separate appraisal of said blast furnace and accessory buildings and of all of the other buildings and structures in this steel plant taxed as real property; which appraisal was made as a part of the sexennial appraisal of the real property in said county. As a result of this appraisal there was a slight decrease in the assessed land value of original lot No. 88 for the tax year 1945; but there was a substantial increase in the buildings valuation in the aggregate of the buildings and structures which were assessed on and with respect to this parcel of land. The assessed figures of the plant property for said tax year were:

| | |
|---|---|
| Land | $ 98,560. |
| Buildings | 17,914,290. |
| Total | 18,012,850. |

The assessed land and buildings valuation of and with respect to this parcel of land for the tax year 1946 were identically the same as those for the tax year 1945. The taxes extended by the county auditor on this parcel of land for each and all of said several tax years at the land and buildings valuation thereof above noted for said tax years were billed to the company in regular course from year to year, and such taxes were paid by the company as the same were billed.

On April 11, 1947, Mr. Frank Ayres, who succeeded Mr. C. S. Kelser as county auditor of said county in the month of March, 1943, and who as county auditor determined the land and buildings valuations of the company's plant property for the tax years 1943 to 1946, inclusive, as above noted, and extended taxes on this parcel of land at such determined land and buildings valuation of the property for said several tax years, made an assessment of back taxes on said blast furnaces Nos. 3 and 4 and on certain buildings and structures accessory thereto for the tax years 1942, 1943 and 1944; which assessment of back taxes on said property was made by the county auditor on the view that such buildings and structures were omitted property for and with respect to said tax years.

The back taxes here in question were assessed and extended by the county auditor upon these blast furnaces and upon the accessory buildings and structures above referred to on the "sound" valuations thereof as determined in and by the detailed appraisal of these buildings and structures made by J. M. Cleminshaw in 1945 as a part of his appraisal of all of the company's plant property then classified and taxed as real property. The county auditor assessed such back taxes on blast furnace No. 3 and its accessory buildings and structures for the tax years 1942, 1943 and 1944 at tax rates of 15.29, 14.98 and 14.32, respectively. And such taxes were assessed and extended for each of said tax years at the following determined valuations:

| | |
|---|---|
| "No. 3 Blast Furnace | $834,816. |
| Skip-Hoist House | 26,496. |
| Concrete Clay House | 3,041. |
| Brick Pump House | 1,178." |

Back taxes were extended on blast furnace No. 4 and its accessory and auxiliary buildings and structures for the tax years 1943 and 1944 at the following valuations:

| | |
|---|---|
| "Blast Furnace No. 4 | $886,992. |
| Skip-Hoist House | 27,072. |
| Concrete Clay House | 3,041. |
| Brick Pump House | 1,203. |
| Brick Pyrometer House | 1,480. |
| Brick Sub-station | 790. |
| Crocker-Wheeler Generator Unit | 22,960." |

Back taxes were extended for the tax year 1944 on the three sanitary buildings built by the company in 1943 at valuations of $5,544, $6,019, and $7,524, respectively; and like taxes were extended on the coke oven gas lines, so-called, at a valuation of $1,832. The total amount of the back taxes assessed and extended against all of said buildings and structures for said tax years 1942, 1943 and 1944 in the aggregate amounted to $66,539.24; and the aggregate amount of the tax penalties assessed thereon was $33,269.52: and the total amount of the back taxes and penalties which were so assessed and which are put in question by this application for the remission of such taxes and penalties is $99,808.76 and, as may be inferred, no payment of these taxes and penalties has as yet been made by the company.

The question presented by this application is whether such back taxes and penalties were properly assessed on these rebuilt blast furnaces and upon the other buildings and structures above noted as buildings and structures omitted from the tax assessments for the tax years 1942, 1943 and

1944 on "OL 88 inside fence 70.40 acres," and at the determined land and building valuations of this parcel for said tax years; or whether said back taxes and penalties thereon were illegally assessed in consequence of the negligence or error of the county auditor in making and extending such tax and penalty assessments. This application, as above noted, is under §5624-10 GC, which provides:

"Sec. 5624-10 GC. The tax commission of Ohio (Board of Tax Appeals) may remit taxes and penalties thereon, found by it to have been illegally assessed, and such penalties as have accrued or may accrue, in consequence of the negligence or error of an officer required to perform a duty relating to the assessment of property for taxation, or the levy or collection of taxes. It may correct an error in an assessment of property for taxation or in the tax list or duplicate of taxes in a county, but its power under this section shall not extend to taxes levied under the provisions of subdivision 2 of chapter 15 of title 2, part second of the General Code."

As above noted, the back taxes and penalties thereon here in question were assessed and extended by the county auditor under §§5573 and 5564 GC; which sections, together with §5576 GC, read as follows:

"Sec. 5573 GC. If the county auditor discovers that any building or structure, tract of land, or any lot or part of either, has been omitted, he shall add it to the list of real property, with the name of the owner, and ascertain the value thereof and place it opposite such property. In such case he shall add to the taxes of the current year the simple taxes of each and every preceding year in which such property has escaped taxation, not exceeding, however, five years, unless in the meantime the property has changed ownership, in which case only the taxes chargeable since the last change of ownership shall be added; or the owner thereof, if he desires, may pay the amount of such taxes into the county treasury, on the order of the auditor."

"Sec. 5564 GC. For the purpose of enabling the county auditor to determine the value and location of buildings and other improvements every individual, partnership, incorporated company, or otherwise, except railroads and public utilities whose property is valued for taxation by the state tax commission, who shall erect or construct any building or other improvement costing over two hundred ($200.00) dollars upon any lot or land within any of the various townships, villages or municipalities not having and requiring a system of building registration and inspection shall within sixty days after said building or other improvement shall have been

commenced, notify the auditor of the county within which such land or lot is located, that said building or improvement has been completed or is in process of construction. Said notice shall be in writing and contain an estimate of the cost of said building or improvement and such description of the lot or land and ownership thereof as will identify the lot or tract of land on said auditor's duplicate.

"Upon failure to give notice as herein provided, and upon said improvement not being returned for taxation as otherwise provided by law, and upon the discovery of such building or improvement by the county auditor after the same has been erected or constructed, the said building or improvement shall be appraised by the county auditor at its true value in money and placed upon the duplicate together with a tax penalty of fifty per cent for each of the years from the date of the erection or construction to the date of discovery.

"Said county auditor may enter, by himself, or deputy, within reasonable hours, and fully examine all buildings and structures of every kind, which are by this title either liable to or exempt from taxation."

Sec. 5576 GC. "Such county auditor, if he ascertains that a mistake was made in the value of an improvement or betterment of real property, or that the true value thereof was omitted, shall return the correct value, having first given notice to the owner or agent thereof, of his intention so to do."

In this connection, it is pertinent to note that inasmuch as these back taxes and penalties were assessed and extended as taxes on real property, no question is now made as to the jurisdiction and authority of the Board of Tax Appeals to consider and determine the merits of the questions presented on this application. (National Tube Co. v. Ayres, Auditor, 152 Oh St 255.) It may be further noted that these back taxes and penalties thereon on the buildings and structures here in question as omitted property for the tax years 1942, 1943 and 1944 were included by the county auditor on the then current tax list and duplicate of the county for the tax year 1946; and no procedural question is here presented with respect to this method of assessing the taxes and penalties herein complained of. See Aetna Co. v. Ginder, Treas., 114 Oh St 52. It may be likewise observed that there is no suggestion in this case of any clerical error on the part of the county auditor with respect to the tax assessments on this parcel of land and on the determined land and building valuations thereof for said tax years. And in this view, no application can be made of the provisions of §§2588 and 2589 GC, referred

to in the case of **Heuck, County Auditor, v. The Cincinnati Model Homes Co., 130 Oh St 378**; which case involved an omission of a part of the valuation of a building on a lot or parcel of land, due to an error in the computation of the valuation of such building.

The first question arising on the facts of this case is whether blast furnaces Nos. 3 and 4 and the auxiliary buildings above referred to, were omitted from the assessment of the company's plant property for the tax years 1942, 1943 and 1944. However, aside from this and the other questions in the case and, apparently, irrespective of the same, counsel for the applicant contends that the back taxes on these buildings and structures were illegally assessed by the county auditor for the reason that no prior notice was given to the company of and with respect to the county auditor's action in making such assessment. As to this, counsel advance the view that §§5573 and 5576 GC, are in pari materia and that, for this reason, the requirement as to prior notice provided for in §5576 GC, should, by construction, be given effect with respect to the action of the county auditor in assessing back taxes on omitted property under the provisions of §5573 GC.

As to this, it is to be observed that the rule contended for as to the construction of statutes in pari materia applies only where the terms of the statute to be construed are ambiguous, or its meaning is doubtful. There is no ambiguity in the provisions of §5573 GC, under which the county auditor made the assessment herein complained of. There is nothing in this statute which requires the county auditor to notify the taxpayer of his intention to assess any building, structure or other real property which has been omitted from assessments in any prior year or years; and, in our view, the rule of pari materia in the construction of statutes does not, in itself, require us to read into this section the requirement as to notice provided for in §5576 GC. In this connection, it is pertinent to note, perhaps, that ordinarily, and from a standpoint of the owner or taxpayer, the inclusion or omission of a building from the assessment of the lot or parcel of land on which it is located, is something which is more or less obvious. See **State ex rel. Bassichis v. Zangerle, 126 Oh St 118, 120.** However, the true value of an improvement or betterment of real property is a matter not quite so obvious to the owner or to the taxing officials. And for this reason, it may be, the Legislature deemed it proper to provide for notice to the owner as a condition to the right of the county auditor to correct an omitted valuation of such improvement or betterment. In this connection, a further question is suggested as

to whether the constitutional requirement of due process of law in the assessment of taxes.required the county auditor to give notice of some kind to the company of his action in making the tax assessment herein complained of. As to this question, it was held in the case of Security Trust and S. V. Co. v. Lexington, 203 U. S. 323, 332, 333, that before an assessment of taxes can be made upon omitted property, notice to the owner or taxpayer is an essential requirement and that somewhere along the line such owner or taxpayer must have an opportunity to be heard, and that this notice must be provided for by statute, and not awarded as a mere matter of favor or grace to the taxpayer. However, in the case above cited, it was further held that where the procedure in the state court, provided for by law, gave the taxpayer an opportunity to be heard upon the question as to the legality and amount of the taxes assessed, the requirement of due process of law in the making of an assessment of this kind is satisfied. See also on this latter point the case of **Hammond, Treas. v. Winder, 100 Oh St 433, 445, 446.** The remedy by way of complaint under §5609 GC, would not have availed this Company with respect to the back taxes assessed on these blast furnaces and other structures above referred to, and this for the reason that under the terms of this section and of §5597 GC, this remedy is limited to questions as to the assessment or valuation of real property for the then current year. (**Swetland Co. v. Evatt, 139 Oh St 6.**) Likewise, with respect to this constitutional question, the remedy which the company is now pursuing under the provisions of §5624-10 GC, is not complete in this, that the Board of Tax Appeals under this section does not have any power or authority to determine any fundamental question as to the valuation of the property assessed. However, as we view it, the remedy by way of injunction provided for by §12075 GC, would have been a complete remedy with respect to both the legality and amount of the taxes assessed against this property of the company. And, on this view, and aside from the recognized limitations on the power and authority of the Board of Tax Appeals to decide questions relating to the constitutionality of statutes, we are of the opinion that the requirement as to prior notice here contended for, cannot be read into the provisions of §5573 GC.

On the hearing of this case, it was conceded by the county auditor that he had erroneously assessed as omitted property the sanitary buildings above referred to. And the first question here presented, as above noted, is whether blast furnaces Nos. 3 and 4 and the auxiliary buildings and structures above

referred to, were omitted from the assessment of "OL 88 inside fence 70.40 acres" for the tax years 1942, 1943 and 1944. For, as to this, it is to be noted that although by the provisions of §§2583 and 5554 GC, the county auditor is required to make separate valuations of the land itself and of the buildings or other improvements thereon, the tax assessment is on the land and upon the buildings and improvements as a part of the land as a single estate or interest; and the tax is extended on the aggregate valuation of both the land and improvements thereon. As to this, see: §§5322 and 5560 GC; People ex rel., v. Swanson, 347 Illinois 649; Friedman v. Kresge Co., 290 Massachusetts 114; Palmer v. Beadle County, 70 S. D. 99.

As to the question here presented, there is some evidence in this case that the county auditor in determining that these blast furnaces and other structures were omitted from the tax assessments of this parcel of land for said prior tax years, acted on a suggestion of some kind made to him by a Mr. Woodward, an appraisal engineer, who was employed by the County Board of Revision of said County to assist it in the consideration and determination of a complaint filed by this company with respect to the taxable valuation of the real property of this plant for the tax year 1946. Although Mr. Woodward attended the hearing of this case for one or more days, he was not called as a witness. And the Board is without knowledge of the facts, if any, which might have led him to make a suggestion of this kind to the county auditor. From the testimony of the county auditor who made the assessment herein complained of, it appears that he made his determination that these blast furnaces and other structures were omitted properties on the fact that no building permit had been issued for the construction thereof and on the further fact, as stated by him that: "our records showed that no increase in values had been made in those years." As to this, it may be observed that no permits were issued for the reconstruction of these blast furnaces for the reason that the City of Lorain, in which this property is located, did not provide for or require the issue of permits for the rebuilding of the furnaces. Moreover, it may be noted that the only purpose that would have been served by the issue of permits for the reconstruction or rebuilding of these blast furnaces, would be to make available to the county auditor information of the fact that the blast furnaces were to be rebuilt. In this connection, it appears, however, that Mr. Kelser, as county auditor, had actual knowledge of the rebuilding of blast furnace No. 3, which was completed in 1941 and of the rebuilding of blast furnace No. 4, which was completed in 1942. It

likewise appears that Mr. Ayres, who succeeded Mr. Kelser as county auditor, was informed of the rebuilding of blast furnace No. 4, shortly after the completion of the work on this project. With respect to the other point referred to in the testimony of Mr. Ayres, the evidence given by Mr. Kelser and by other witnesses in the case supports the view that the increased valuation of blast furnace No. 3, as reconstructed, was reflected in the aggregate assessed land and buildings valuation of the plant property for the tax year 1941, which aggregate, as above noted, was $1,370,480 in excess of the aggregate land and building valuation of the property for the year 1940. And it may be assumed that this increased valuation of blast furnace No. 3 as the same was carried into the aggregate assessed valuation of the property for the year 1941, was likewise reflected in the aggregate and lump sum assessed "buildings" valuations of the plant property for the tax year 1942 and subsequent years. As to blast furnace No. 4, Mr. Kelser testified that he did not recall he had made any increase in the assessment of the plant property on account of this blast furnace. In this connection, it may be pertinent to note that as shown by the company's records and by the balance sheets, above referred to, the net removals for the year 1942 (the excess of the book cost of structures or other items of real property removed over the book cost of additions of buildings or other items or real property to the plant as a whole) was $185,960. Whether Mr. Kelser, as county auditor, in making his assessment of the plant property for the tax year 1942, had knowledge of the fact that the book cost of the removals from the plant property exceeded the book cost of the additions thereto, does not appear in the evidence in this case. In this connection, it does appear that Mr. Kelser in testifying as to his assessment of the company's property, stated that it was his intention to assess everything "inside the fence"; which expression as understood by the company officials and by successive county auditors, and as shown by the undisputed evidence in this case, included every building and structure or other item of fixed equipment taxed as real property in the whole of the company's steel plant at this location. With respect to the assessment of this property for the tax year 1943, it appears that in September of that year, six months or more after Mr. Ayres became county auditor, Mr. Phinney, deputy county auditor in charge of real property assessments, wrote to the home office of the company at Pittsburgh making inquiry, among other things, as to "whether or not in the year 1942 any new buildings or alterations to existing buildings were made in your Lorain plant and, if

so, the approximate increase in valuation." This information was, presumably, desired by the deputy in connection with the assessment of the plant property for the tax year 1943. A few days later, the tax supervisor of the company directed a reply letter to the attention of Mr. Phinney, in which there was a statement of the book cost of the buildings, machinery and equipment taxed as real property at the Lorain plant as of December 31, 1941, and a statement of the book cost of this property as of December 31, 1942; from which statements it appeared that there was a decrease of the book cost of said property as of December 31, 1942, as compared with the book cost of the property as of December 31, 1941, in the amount of $185,960 which, as above noted, is the amount of the Company's net removals for the year 1942 as shown by the balance sheets filed by the Company with its personal property tax return. Although this information, furnished by the company's tax supervisor was not, perhaps, directly responsive to the inquiry made in Mr. Phinney's letter, yet inasmuch as to the knowledge of all persons concerned, all of the buildings, structures and other fixed equipment had been assessed and was then being assessed in the aggregate at a lump sum valuation, this information contained in the company's letter, was pertinent and gave to the county auditor information which would be helpful in determining the assessed lump sum valuation of such property for the tax year 1943. What, if any, consideration was given to this information by the county auditor or deputy does not appear. However, it does appear that the assessed lump sum valuation of all of the buildings, structures and fixed equipment of the company's plant for the tax year 1943 was $11,704,880, which was the aggregate lump sum valuation of the property for the year 1942.

For the tax year 1944, there was an increase of something more than $40,000 in the assessed lump sum valuation of the company's buildings, structures and other items of fixed equipment. What particular item or items accounted for this small increase in the over-all buildings valuation of this property, does not appear; although it is pertinent to note in this connection that the net additions to the plant property for the tax year 1943 were, at book cost, the sum of $225,387 as reported by the company in its balance sheet filed with the Tax Commissioner. In the assessment of this parcel of land for the tax year 1945, the buildings, structures and other items of fixed machinery and equipment of the plant were included, as before at an over-all tax valuation; but in this year, for the first time, this over-all valuation was the aggregate of the valuations of the separate buildings, structures and other

items of real property determined on the detailed Cleminshaw appraisal which was completed in that year; and it was not, as in former years, a lump sum appraisal of such property as a whole without any breakdown or other source of information as to the separate valuations of such buildings, structures and other items. The assessment of this property for the tax year 1946 was in all respects the same as that made in the tax year 1945.

In our further review of the evidence in this case, it is pertinent to note that counsel in the case have different views as to the significance, with respect to the question here presented, of the fact that the company in filing its annual intangible and personal property tax returns for the several tax years here in question, gave to the Tax Commissioner information relevant to changes in the value of the real property owned by it (§5372-1 GC) in the balance sheets filed with such tax returns rather than in and by forms in the tax return more especially provided for with respect to information of this kind. However, as we see it, the only purpose that could be served by this information, however given, would be as an available source of information to the county auditor as to additions to or removals from the plant property. As to this, it may be observed, as above noted, that as to the rebuilt blast furnaces here in question, the county auditor in assessing this property had full knowledge of the fact that such blast furnaces had been rebuilt.

However, as we view this case, the question whether these rebuilt blast furnaces and auxiliary buildings and structures were omitted from the assessment of this parcel of land for the tax years 1942, 1943 and 1944 is to be determined upon undisputed facts as they appear in the case as the same was presented to the Board. Blast furnaces 3 and 4, as rebuilt, and the accessory and auxiliary buildings and structures, here referred to, are located on Original Lot 88, a parcel of 70.40 acres. In the assessment of this parcel of land for each of the then current tax years here in question, the assessment in each instance, as appears from the county auditor's entries on the tax lists and duplicates for said several tax years, was on said parcel of land, as above designated, and as to everything "inside fence"; which expression, as to buildings, structures and other items of real property, included, to the knowledge of the county auditor and as shown by the undisputed evidence in the case, these rebuilt blast furnaces and every other building, structure and fixed equipment taxed as real property in this steel plant; and it further appears without question that the "buildings valuation" of this parcel

of land as the same was assessed for taxation in each of said several tax years, was in each instance a lump sum valuation as determined by the county auditor of these blast furnaces and auxiliary structures and of every other building, structure or other item of real property in this steel plant. And, in this connection it is to be presumed that these tax assessments, so made, were in each of these tax years, laid before the county board of revision as provided for by §5605 GC, and were passed upon by that body before the same became a part of the tax list and duplicate of the county for said several tax years.

In this situation, we are of the view that these blast furnaces and other structures here in question were not omitted from taxation in the assessment of said parcel of land for the tax years 1942, 1943 or 1944. For, as to each of these tax years, the buildings, structures and other items of fixed equipment included by the county auditor in the assessment of this parcel of land were identically those which he intended to assess as a part of this parcel; and his tax valuation of the same was that intended by him. Upon these facts it may be observed, as noted in the opinion of the Supreme Court of this state in the case of Heuck, county auditor, v. the Cincinnati Model Home Co., supra that in a situation of this kind "there is no omitted property which may be supplied."

As to the further question here suggested as to whether the value or increased value of these reconstructed blast furnaces and auxiliary buildings and structures were reflected, or fully reflected in the over-all and lump sum tax valuations of all of the buildings and structures of the plant property for said several tax years, this is, quite obviously, a different question from that presented in this case. And it may or may not be that the county auditor, as to any or all of the tax years here in question, might have made a correction in the tax valuation of the plant property by reason of the unreflected increase, if any, in the value of such reconstructed blast furnaces and other structures here referred to, by timely proceedings therefor under §5576 GC, and after giving notice to the company as therein provided.

However this may be, it is quite certain that where, as in this case, the buildings and structures in question were actually included in the assessment of the parcel of land on which they were located, the county auditor was without authority to assess back taxes on such buildings and structures as omitted property on the view that the increased value of such buildings and structures were not reflected, or fully reflected, in the over-all valuation of all of the buildings and structures of the company's plant. See **Humphreys v. The**

Safe Deposit Co., 29 Oh St 608, 610; Davidson v. Franklin Avenue Investment Co., 129 Minn., 87; Roberts, Treas., v. Fair 174 Okla. 139; People ex. rel. v. Chapman 370 Ill. 430; Palmer v. Beadle County, 70 S. D. 99; Marshall Wells Co. v. Foster County 59 N. D., 599; E. K. Wood Lumber Co. v. Whatcom County, 5 Wash. (2d), 63.

We are of the opinion, therefore, on the questions above noted, that the back taxes and penalties thereon assessed by the county auditor on said blast furnaces 3 and 4 and auxiliary buildings and structures, above referred to, for the tax years 1942, 1943 and 1944, were illegally assessed by said officer in consequence of his error in finding that such buildings and structures were omitted property for said tax years.

As above noted herein, the National Tube Company in and by this application for tax and penalty remission, contends that the back taxes and penalties thereon assessed on blast furnaces Nos. 3 and 4 and auxiliary structures, above referred to, as omitted property, were assessed as real property taxes on the tax list and duplicate of the county; that these blast furnaces and auxiliary structures by reason of their construction, use and operation, were and are personal property, and that for this additional reason the taxes and penalties herein complained of are illegal. Sometime after this application for tax and penalty remission was filed with the Board of Tax Appeals, the company, by its motion filed herein, withdrew from the consideration of the Board, with respect to this question, such auxiliary structures referred to as skip-hoist houses, clay houses, pump houses, and a pyrometer house and substation which were operated in connection with said blast furnaces; and we assume that so far as this hearing before the Board is concerned, the company now concedes that these auxiliary structures were and are real property.

This leaves for our consideration the question as to whether these blast furnaces and certain accessory structures and equipment which were appraised and assessed as integral and component parts of the several blast furnaces, were and are personal property. These particular blast furnaces, referred to as Nos. 3 and 4, are part of an integrated steel plant owned and operated by the company at this location, the end products of which are, for the most part, butt welded and seamless pipes. The initial operation in the production of the steel from which these pipes are made, is the manufacture of iron in the blast furnaces of the company, of which the two here in question are a part. In this connection, it is pertinent to state that the iron, after it is produced in the blast furnaces, is taken to either the Bessemer or open hearth converter where the iron is converted into steel; which is poured into

molds for the purpose of putting the steel in the form of ingots which are taken to heavy rolling mills where the ingot is converted into slabs and billets of suitable shapes and sizes for further operations in the production of butt welded and seamless pipes.

A prime consideration with respect to the question as to whether blast furnaces Nos. 3 and 4, and their component parts were and are personal property is that relating to the construction, operation and use of the blast furnaces; and as to which there is no dispute in evidence in this case. These blast furnaces are substantially identical as to size; construction, operation and capacity and as to the accessory structures and equipment constituting component parts thereof. A review of the evidence in this case discloses that the facts relating thereto are accurately stated in the brief of counsel for the applicant as follows: "The blast furnace proper, or stack as it is sometimes called, rests on a concrete pad or foundation about 60 feet in diameter which extends about 3 feet above and 9 feet below ground. The blast furnace itself is divided into the following sections beginning at the foundation pad: hearth, bosh, shell and top structure. The blast furnace hearth is laid on the foundation pad and the pad also supports the columns which in turn support the stack or shell of the furnace. The hearth wall is constructed of refractory brick extending vertically approximately 12 feet above the pad, in which case iron coils are set, through which water circulates. The inside diameter of the hearth is 26 feet. The bricks laid in the hearth are called 'hearth blocks,' which are 18 inches by 9 inches by 4½ inches and are laid on end and are wedged in. They are bonded by a very light bond of grout which is a mixture of fire clay powder and water of about the consistency of thick pea soup. It is not cement. The wall of the hearth is approximately 3 feet thick. Carbon brick about 4 inches thick are also laid in the bottom of the furnace to prevent the erosion of iron.

"Immediately above the hearth, starting about the tuyeres (the nozzle apertures through which hot air is forced into the furnace), is a section called the 'bosh,' having an outward taper or batter and extending approximately 12 feet above the hearth. The diameter of the top of the bosh of the furnace at the mantle line is 29 feet 6 inches, and this because of the flare-out of the bosh. The bosh walls are constructed of refractories in which are inserted cooling boxes through which water circulates. The reason for this construction is that this is the hottest part of the furnace, the temperature running up to a little over 3,000 degrees Fahrenheit, and if cooling elements were not employed, the refractory

brick would be destroyed in a very short period of time. The refractory brick used in the bosh wall are of special shapes and accommodate these cooling boxes. The refractories are bonded with a fire clay grout so as to form a wall which is as nearly gas tight as is possible. The bosh wall is about 30 inches in thickness.

"At the top of the bosh wall is the mantle plate of the furnace shell which forms the bottom plate of the shell, and is supported by steel columns which are anchored to the furnace foundation. They are shrouded by a casing with a flared-out base to give them support. They are held in place by an encircling ring from column to column which joins them and keeps them in position and in place. The shroud is to protect the steel columns in the event of a break-out of the furnace, and the shroud protects the column and prevents the same from being burned off under such circumstances. Brick is also used around the base of the columns to protect them against the flow of molten iron if it should break out any place. The brick used are refractory brick and have no structural function.

"The stack shell starts at the mantle ring and extends straight upward for about 9 feet and then converges inward to the top of the shell approximately 71 feet to the deck ring. The inside diameter at the top of the shell is 20 feet. The shell is conical in shape and is constructed of boiler plate approximately 1 inch thick, which is butt welded in place. The stack shell is lined with refractories approximately 4 feet in thickness and has copper cooling boxes inserted in the refractory lining for about 1/3 of the way up the stack. The over-all height of the furnace from the bottom of the furnace to the extreme top is 219 feet. The weight of the shell, including all of the brick lining and all of the top structure of the furnace, is supported by the columns which support the mantle so that it is possible to remove the hearth and the bosh of the furnace without affecting the furnace proper about the mantle ring. It is necessary to reline blast furnaces about every five or six years of operation. This requires the removal of all of the refractories from the furnace and the putting in of new refractories.

"At the top of the shell is located the machinery for charging the raw materials into the furnace. The lower part of this apparatus consists of a cylindrical hopper with a slight inward slope fitted into the throat of the shell and supported by the deck ring. Setting against the bottom of the hopper is a large conical bell. Extending into the top of the sealed chamber is a cylindrical structure designated as the 'barrel.' In the bottom of the barrel is a second conical bell which is

referred to as the small bell. Immediately above the receiving hopper is the upper end of the skip hoist upon which is operated the skip bucket. The raw material (iron ore, coke and limestone) is brought up in the skip bucket from the stock house near the base of the furnace by the skip hoist to the top of the furnace and is there dropped into the receiving hopper and down into the barrel, where the material is deposited in the small bell at the bottom of the barrel. The material is then dumped down on the large bell which is in a closed position. The small bell is then closed and the large bell is lowered to allow the materials to drop into the furnace. This system of trapping material into the furnace prevents gas from blowing out of the furnace while the material is being put in. The gas which would otherwise escape is drawn off from the gas-tight sealed chamber between the bells into the 'downcomer.' The uptake and down comer are steel refractory lined pipes taking off gas from the furnace down to the dust catcher. These pipes are lined with refractories about 4½ inches thick to protect the steel pipe from temperatures of the gas which may sometimes go as high as 1000 to 1200 degrees Fahrenheit, although the normal temperature is 300 degrees Fahrenheit. The mechanism above the top deck of the furnace shell is generally known as the top structure of the furnace. It is constructed of boiler plate and steel castings, assembled piece by piece and joined together, so that it may be easily removed as it has to be repaired from time to time."

As to the accessory structures which were appraised and assessed as a part of these blast furnaces in the assessment of back taxes herein complained of, the first of such structures above noted are the skip hoists. The skip hoist is a steel structure extending on an incline from the stock house at the base of the furnace to the top structure of the furnace, and upon the double track of which inclined structure ore, coke and limestone, as raw materials, are carried from the storage bins to the top of the blast furnace where they are charged into the furnace by means of the bell and barrel arrangement above mentioned. As other accessories each of these blast furnaces has connected therewith a cast house, a dust catcher, gas washers and precipitators, stoves, as well as gas burners and blowers and blowing engines. The cast house is a structure made of boiler plate which is built around the lower section of the blast furnace. It is supported by steel columns fastened to the blast furnace foundation by stud bolts and nuts; and serves the purpose of protecting the runways which receive the molten iron after the same has been tapped from the furnace. The dust catcher is a cylindrical structure approxi-

mately 25 feet in diameter and 35 feet high. It is constructed of steel plates riveted together and is lined with brick. By means of the dust catcher metallic and other dust in the gases which escape from the furnace is recovered for further use in the operation of the furnace after the same has gone through the sintering plant. The gas containing such dust is carried down to the dust catcher by means of the "down comer" pipes before mentioned. The foundations of the dust catcher are independent of the foundation of the furnace; and the structure is supported by columns which are fastened to its foundation by means of stud bolts and nuts. After this gas goes through the dust catcher it is further cleansed successively in the gas washer and precipitator. The gas washer is a cylindrical shell about 60 feet high and 12 feet in diameter constructed of steel plates riveted together. It is supported about the ground by steel columns which are fastened to its foundation by stud bolts and nuts. The gas washer is connected to the dust catcher by pipes; and after the gas has been cleansed as much as is possible in the gas washer it is conducted by a pipe to the precipitator which is a cylindrical shell about 18 feet in diameter and 20 feet in height, where the gas is further cleansed and made useful for burning in the stove installations and for other purposes. This precipitator is a cylindrical shell constructed of boiler plate and is about 18 feet in diameter and 20 feet high. As in the case of the gas washer, it is attached, to its own foundation by stud bolts. As accessory structures which are used in connection with the two blast furnaces here in question, are a number of stoves; four of which are used in connection with blast furnace No. 3, and five of which are used in connection with blast furnace No. 4. The stove is a cylindrical steel shell about 21 feet in diameter and 100 feet high, which is filled with brickwork laid in checker fashion. The foundation of the stove is in each instance separate from the foundation of the blast furnace with which it is connected. These stoves are used for the purpose of heating air by means of the gas from the furnace after it has been washed and cleansed in the manner above stated. After the air in these stoves has been heated to a temperature of approximately 1100 degrees Fahrenheit it is forced under pressure into the blast furnaces through the tuyeres above mentioned. Accessory installations are gas burners which are used in heating the air in the stoves and blowing engines which compress atmospheric air which creates the blast in the furnace.

The facts above stated as to the construction of these blast furnaces and of their accessory structures, sufficiently indicate

the manner in which these furnaces are operated. It is sufficient to state further, in this connection, that to make a ton of pig iron requires approximately 2 tons of ore, 9/10 of a ton of coke and about ½ ton of limestone; which materials are charged into the furnace every 8 or 10 minutes. The blast furnace operates 24 hours a day and 365 days a year as long as it is in blast, and operation of the furnace is stopped only for purposes of repairs. The molten iron is tapped and run off once in every 6 hour period; and the capacity of each of these furnaces is 1150 tons of iron daily.

In connection with evidence offered and introduced in the case relating to the construction of these blast furnaces and of their accessory structures, evidence was likewise received as to the removability of blast furnaces. As to this, it appears from the evidence that blast furnaces, ponderous as they are, may be and have been removed from one location to another, in and out of this State, from State to State, and from one country to another.

As before noted, these blast furnaces and the accessory structures comprising a part of the furnaces with respect to the tax assessment here in question, were assesed as real property which, in the view of the county auditor, had been omitted from taxation for the tax years 1942, 1943 and 1944; and the back taxes which were extended by the county auditor on these blast furnaces and accessory structures as omitted property were, of course, real property taxes. The further question presented in this case is whether such blast furnaces and other property were, under the facts of the case, properly classified as real property for purposes of taxation or whether, on the other hand, these blast furnaces and accessory structures were personal property and taxable only as such. As to this it may be observed that aside from a recognition of the rules applied by the Supreme Court of this State in the case of Zangerle, Aud., v. Standard Oil Company of Ohio, 144 Oh St 506; Standard Oil Co. v. Zangerle, Aud., 144 Oh St 523; Zangerle, Aud., v. Republic Steel Corporation, 144 Oh St 529; and Roseville Pottery, Inc., v. County Board of Revision of Muskingum County, 149 Oh St 89, one would have difficulty in visualizing the massive and ponderous structures under consideration in these cases otherwise than as structures constituting a part of the land upon which they were located. However, in each of these cases the Supreme Court, upon a consideration and application of pertinent rules of law with respect to the construction and use of the structures there in question, determined that such structures were personal property and taxable as such. A diligent review and consideration of the evidence in this case relating to the construction

and use of these blast furnaces and other structures here in question fails to disclose any facts which serve to distinguish under any principle of law these blast furnaces and other structures from the particular structures under consideration in the cases just cited. These blast furnaces and other structures, in their use for the production of iron, are devoted primarily to the business of the steel plant conducted on the premises; and they were constructed and erected on the premises for this purpose and not as accessions to the real estate as such. See Zangerle, Aud., v. Standard Oil Company of Ohio, Zangerle, Aud., v. Republic Steel Corporation, and Roseville Pottery, Inc., v. County Board of Revision, supra. In this view it can be further said that aside from their use for the production of iron as a part of this steel plant, these blast furnaces and accessory structures are not improvements on the land as such within the provisions of Section 2 of Article XII of the State Constitution or of §5388 GC, or otherwise. And since these blast furnaces and accessory structures are not improvements on land, §§5386, 5388 GC, and related sections of the General Code provide for their taxation as implements used in manufacturing and as personal property at a list or assessed valuation of 50% of their true value in money. Inasmuch as the taxation of these structures as implements used in manufacturing and as personal property has been thus specially provided for, they are excepted from the provisions of §5322 GC, which might otherwise have the effect of making them real property for purposes of taxation. Zangerle, Aud., v. Republic Steel Corp., and Roseville Pottery, Inc., v. County Board of Revision, supra. See, also, on this point Reed, Appellant, v. County Board of Revision of Fairfield County, 152 Oh St 207, 210.

Upon the considerations above noted the Board is of the view that the blast furnaces and accessory structures here in question were and are personal property and taxable only as such; and that for this additional reason this particular property was illegally assessed by the county auditor in the assessment complained of in said application for tax and penalty remission. And we are of this view notwithstanding the fact that the Tax Commissioner, by his Rule No. 7 adopted under date of July 5, 1939, has classified blast furnaces and accessory structures and equipment of the kind herein referred to as real property; for, as to this, it is obvious that this rule of the Tax Commissioner cannot have the binding force of law in our decision on this question as the same is presented in this case. Roseville Pottery, Inc., v. County Board of Revision, supra.

As before noted, there were and are a number of auxiliary buildings and structures which were not appraised and assessed as a part of these blast furnaces in the assessment of back taxes herein complained of. These buildings and structures were separately assessed as property which, in the view of the county auditor, had been omitted from taxation for the tax years 1942, 1943 and 1944. As is above noted, inasmuch as the company, by amendment of its application, has in effect, conceded these buildings and structures to be real property for purposes of taxation, they have been omitted from the present discussion relating to the taxable character of the blast furnaces and accessory structures above referred to. However, as herein found by the Board, such auxiliary buildings and structures, as well as the blast furnaces and accessory structures here in question were, as a matter of fact, assessed as real property and as a part of the company's steel plant property for the tax years 1942, 1943 and 1944. The Board further finds, therefore, that none of the property described in the company's application was omitted property within the purview of §5573 GC, or otherwise at the time of the assessment of the back taxes and the penalties herein complained of.

Upon all of the considerations above noted and discussed the Board of Tax Appeals finds that the back taxes and penalties herein complained of were illegally assessed by reason of the error of the county auditor in the respects above noted: and it is, therefore, considered and ordered that the back taxes and penalties complained of in the application filed herein by said company be, and the same hereby are, remitted.

It is further by the Board considered and ordered that a copy of this order and entry be directed to the county auditor of Lorain County, Ohio, to the end that he may correct his tax records in accordance with the finding and order of the Board herein made.

I hereby certify the foregoing to be a true and correct copy of the action of the Board of Tax Appeals of the Department of Taxation this day taken with respect to the above matter.

Joseph D. Bryan,
Secretary.